IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEREMY L. BENSON, | § | |
| | § | |
| Defendant Below, | § | No. 497, 2019 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 1712014868A (N) |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: September 4, 2020
Decided: November 6, 2020

Before **SEITZ,** Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

## **ORDER**

Upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) The defendant below-appellant, Jeremy L. Benson, filed this appeal from his conviction for attempted first-degree rape as a lesser-included offense of first-degree rape. After careful consideration of the parties' arguments, we affirm the Superior Court's judgment.

(2) In February 2018, a New Castle County grand jury charged Benson with first-degree rape and sex offender unlawful conduct against a child. The parties agreed to try the rape charge first, and separately, from the other charge. In March 2019, the first trial ended in a mistrial.

(3)     The evidence presented at the second trial, in June 2019, established that a therapist reported a child's ("the Child") disclosure of sexual abuse in March 2017. The Child, who was born in 2003, disclosed that he had sexual contact with his younger sister[1] and that Benson, his uncle, had molested him. According to the police reports of the Wilmington Police Department detective assigned to investigate the case, the Child reported that Benson assaulted him at the family's Church Street address in 2015 or 2016. The detective later learned that the family moved out of the Church Street address to live at a new address by October 1, 2014, but did not update his reports. It was unknown when the family moved into the Church Street address, but the Child's father thought they lived there for about a year-and-a-half.

(4)     The Child's mother, who suffered from seizures that sometimes affected her memory, testified that Benson was her brother. Both of the Child's parents recalled an incident at the Church Street address involving Benson. They had left the residence, possibly to find food for the family. While they were gone, they left the Child in charge of his four younger siblings. The children understood that they were not to open the door to anyone and that Benson was not permitted inside the home.

---

[1] The Superior Court granted Benson's motion to offer evidence relating to the Child's sexual conduct under Delaware's rape shield law, 11 *Del. C.* § 3508. Benson's defense at trial was that the Child and his family members lied about what Benson did to the Child because they feared the Child could go to jail for what he did to his sister.

(5) The Child called his parents to report that Benson came inside the house. The parents returned to the home where they found Benson (inside the house according to the Child's mother and outside the house according to the Child's father). The Child's mother and Benson got into an argument. Benson was upset that one of the children had told him to "get the F out" and said the children could "suck his dick."[2] After the Child's mother shoved Benson into a fireplace, Benson left the house. The parents yelled at the Child and punished him for letting Benson into the house.

(6) After the family moved out of the Church Street address, the parents noticed that the Child was lying, stealing, and acting angry. In 2017, one of the Child's younger sisters told the parents that the Child had touched her inappropriately. The mother testified that when she and the father spoke to the Child about this, he disclosed for the first time that Benson had sexually assaulted him. The father testified that the Child did not disclose Benson's assault at that time.

(7) Both parents testified that they were concerned the Child might go to jail because of what he did to his sister. They chose not to contact the police, but instead took the Child to a therapist. After the Child told the therapist about what he had done to his sister and what Benson had done to him, the therapist reported

---

[2] Appendix to State's Answering Brief at B290.

the incidents to the authorities. The father testified that he learned of Benson's assault after the Child disclosed it to the therapist.

(8) The Child testified that Benson forced his way into the Church Street home after the parents left the Child alone with his younger siblings. The Child was downstairs and his four younger siblings were upstairs. After hearing a knock at the door, the Child opened the door even though his parents had told the children not to open the door when they were not there. When the Child saw it was Benson at the door, he tried to close the door because Benson was not allowed in the house. Benson pushed his way into the house and pulled the Child in the bathroom. The Child testified that Benson locked the bathroom door, bent the Child over the bathtub, put his hand over the Child's mouth, pulled down the Child's pants and underwear, and put his penis between the Child's buttocks. The Child was not sure if Benson's penis penetrated his anus, but said there was pain.

(9) After the Child's younger brother cursed and told Benson to get out of the house, Benson pulled up his pants, unlocked the bathroom door, and left the bathroom. Before leaving the bathroom, Benson told the Child that if he told anyone about what had happened, Benson would kill his parents. Benson left the house to sit outside in his car.

(10) The Child called his parents about Benson coming into the house. The parents came home and got into a fight with Benson in the house. The Child testified

4

that his mother shoved Benson into a fireplace. The Child did not tell his parents about what happened in the bathroom because they were already angry with him for opening the door and he did not want to cause more trouble. The Child said he did not tell his parents about what Benson had done until shortly before or around the time they learned what he had done to his younger sister. The Child admitted that he was charged with felonies for what he did to his younger sister.

(11) On direct and cross-examination, the State and Benson explored differences between the Child's trial testimony and his previous accounts of the assault. These differences included: (i) the Child stating during a May 2017 interview at the Children's Advocacy Center ("CAC") that Benson bent him over a sink, not a bathtub, and that only two, instead of four, of his younger siblings were in the house at the time of the assault; (ii) the Child stating on another occasion that Benson put his elbow, not his hand, over his mouth; and (iii) the Child telling his therapist that Benson almost molested him, but did not because his younger brother started yelling.

(12) Two of the Child's younger siblings also testified about the incident at the Church Street home. The younger brother testified that he was standing on the stairs when he saw Benson push past the Child to come into the house and go toward the bathroom. The younger brother cursed and told Benson to get out because he was not supposed to be in the house. Benson left the bathroom and demanded to

5

know who had cursed at him. According to the younger brother, the Child had a weird look on his face and tears in his eyes. When asked why he said only he, the Child, and a younger sister were at the house during a May 2017 interview at the CAC, the younger brother, like the Child, said he did not mention the presence of two younger siblings because he wanted to protect them.

(13) One of the Child's younger sisters testified that she and her brother came down the stairs when their two youngest siblings told them that the Child had let Benson into the house. She saw the Child follow Benson, heard the toilet flush, and heard her older brother curse and tell Benson to get out of the house. She testified that the Child's eyes were watering and Benson was buckling his pants when he left the bathroom. During her interview at the CAC, she said that Benson had dragged the Child into the bathroom and that the two youngest siblings were not at the house at time of the incident. Both the Child's younger brother and younger sister testified that they could not see the bathroom from where they were standing on the stairs. They also testified that Benson fought with their parents when they came back to the house, which led to their mother pushing Benson into a fireplace.

(14) At the conclusion of the State's case, Benson moved for a judgment of acquittal. The Superior Court denied the motion.

(15) Benson, who was born in 1971, testified that he did not get along with his sister. After their father died, Benson went to his sister's Church Street address

6

between 2013 and 2014 to collect some of their father's belongings. Shortly after Benson arrived at the house, the Child's parents arrived and went into the house with Benson. According to Benson, he was never in the house alone with the children, but he did see the Child and two of his siblings.

(16) After entering the house, Benson immediately went to use the bathroom. He testified that no one was in the bathroom with him, and that he did not assault the Child. After he left the bathroom, he got into a fight with his sister in which she poked him a couple of times. The Child's younger brother cussed at Benson and told him to get out of the house. Benson left the house and did not have any more contact with his sister or her family.

(17) The jury found Benson not guilty of first-degree rape and guilty of attempted first-degree rape. The State chose not to proceed on the sex offender charge. The Superior Court sentenced Benson to thirty-five years of Level V incarceration, suspended after twenty years for decreasing levels of supervision.[3] This appeal followed. On appeal, Benson exercised his constitutional right to represent himself.

(18) Benson's arguments on appeal may be summarized as follows: (i) the arrest warrant and indictment contained false statements in violation of the Due

---

[3] The Superior Court also sentenced Benson for breach conditions of release in Criminal ID No. 1803003163.

7

Process Clause and the Fourth and Fourteenth Amendments of the United States Constitution; (ii) the Superior Court violated his right to a speedy trial; (iii) the Superior Court erred in permitting the State to amend the indictment; (iv) the Superior Court erred in denying his motion to dismiss based on a violation of the Double Jeopardy Clause; (v) the Superior Court erred in giving a jury instruction for the lesser-included offense of attempted first-degree rape when neither party requested such an instruction; (vi) there was insufficient evidence to support his conviction; and (vii) the State knowingly used the Child's false statements to obtain his conviction.

### *False Statements in the Arrest Warrant and Indictment*

(19)   Benson did not raise his claim that the arrest warrant and indictment contained false statements in violation of the Due Process Clause and the Fourth and Fourteenth Amendments of the United States Constitution, so we review this claim for plain error.[4]  Plain error "is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[5]  An arrest warrant is valid if the issuing judicial officer is "presented with sufficient information to support an independent judgment that

---

[4] Supr. Ct. R. 8.

[5] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

8

probable cause for the warrant exists."[6] An indictment is sufficient if it contains a "plain, concise and definite written statement of the essential facts constituting the offense charged" that puts the defendant on notice of the charges he must defend and bars subsequent prosecution for the same offense.[7]

(20) Benson does not identify the statements in the arrest warrant or indictment that he contends are false, but points to trial testimony that he claims is evidence of fabrication by the Child and his family members. The arrest warrant described how Benson sexually assaulted the Child in the first floor bathroom of the Church Street residence, with the Child believing (in 2017) that the assault occurred in 2015. The indictment charged Benson with intentionally engaging in sexual intercourse with a child under the age of twelve when he was over the age of eighteen on or between May 1, 2014 and November 1, 2014.[8] The arrest warrant contained sufficient information for a magistrate to determine there was probable cause to arrest Benson for the crimes for which he was charged. The indictment satisfied Superior Court Criminal Rule 7(c)(1), put Benson on notice of the charges he had to defend, and effectively barred subsequent prosecution for the same offenses.

---

[6] *Thomas v. State*, 467 A.2d 954, 956 (Del. 1983).

[7] Super. Ct. Crim R. 7(c)(1); *Mayo v. State*, 458 A.2d 26, 27 (Del. 1983).

[8] The amendment of this date range is addressed later in this Order.

Benson has not shown that any differences between the arrest warrant or indictment and the trial testimony constitute plain error.

### *Right to a Speedy Trial*

(21)   Benson argues that there was a violation of his Sixth Amendment right to a speedy trial.  He did not raise this claim below so we review for plain error.[9]  To determine if there is a speedy trial violation, we use the four-factor balancing test set forth in *Barker v. Wingo*.[10]  The four factors are the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant.[11]  The factors are related and no one factor is conclusive.[12]

(22)   A defendant's right to a speedy trial "attaches as soon as the defendant is accused of a crime through arrest or indictment whichever occurs first."[13]  Unless the length of delay is determined to be "presumptively prejudicial," it is not necessary to consider the additional *Barker* factors.[14]  This Court has held that if the

---

[9] Supr. Ct. R. 8; *Page v. State*, 934 A.2d 891, 896 (Del. 2007).

[10] 407 U.S. 514 (1972).  *See also Johnson v. State*, 305 A.2d 622, 623 (Del. 1973) (adopting *Barker* test)).

[11] *Barker*, 407 U.S. at 530.

[12] *Middlebrook v. State*, 802 A.2d 268, 273 (Del. 2002) (citing *Barker*, 407 U.S. at 533)).

[13] *Id.*

[14] *Barker*, 407 U.S. at 530.

delay between arrest or indictment and trial approaches one year, then the Court will generally consider the additional factors.[15]

(23)  We will consider the additional factors here because there is more than one year between Benson's arrest (January 3, 2018) and first trial (March 2019). Trial was originally scheduled for September 2018. In August, defense counsel requested a continuance to obtain additional discovery from the Division of Family Services. A November trial date was suggested, but the matter was specially assigned and the assigned Superior Court judge was doing her civil rotation then and had a conflict. Trial was rescheduled for February 5, 2019, but on that date the parties jointly requested a two-week continuance to address the admissibility of the Child's sexual offenses against his sister under 11 *Del. C.* § 3508. There were also issues concerning the State's discovery obligations. Trial was rescheduled to commence on February 18, 2019, but the Superior Court moved the trial date back to March 5, 2019 based on the evidentiary and discovery issues raised by the parties. After the first trial ended in a mistrial, a second trial was rescheduled for June 2019.

(24)  Benson attributes the delays in the scheduling of the first trial to the State's withholding of discovery. The State admits that the delay "may be partially attributable to the State," but contends Benson was equally if not more responsible

---

[15] *Cooper v. State,* 2011 WL 6039613, at *7 (Del. Dec. 5, 2011).

for the delays.[16]  The record does not support the latter contention, but does reflect that neither side was solely responsible for the delays.  This is unlike *Dabney v. State*,[17] which Benson relies upon to argue that there was a violation of his right to a speedy trial.  In *Dabney*, this Court found a speedy trial violation where the delays were solely attributable to the State's failure to promptly obtain DNA testing that was not even necessary for the prosecution of the case.[18]

(25)   As to the third *Barker* factor—the defendant's assertion of his right to a speedy trial—Benson did not assert his speedy trial rights in the Superior Court.  Benson points to letters that he claims to have sent to his counsel regarding the delays, but his counsel requested or agreed to the continuances.

(26)   Finally, we consider the prejudice factor in light of the interests that the right to a speedy trial is designed to protect: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired."[19]  Benson was incarcerated throughout the pretrial proceedings, which caused him anxiety and stress.  Benson has not shown that the delay caused any impairment to his defense.  He claims that the delay caused him to lose a key witness and almost caused him to lose two

---

[16] Answering Brief at 22.

[17] 953 A.2d 159 (Del. 2008).

[18] *Id.* at 165-69.

[19] *Weber v. State*, 971 A.2d 135, 162 (Del.2009).

12

additional key witnesses, but does not explain who these witnesses were or why they were key.

(27) Having considered all of the *Barker* factors, we conclude that they do not weigh in favor of finding a violation of Benson's right to a speedy trial. More than a year passed between Benson's arrest and first trial date, but the delays were not solely attributable to the State, Benson did not object to the continuances of the trial date or raise his speedy trial rights in the proceedings below, and Benson has not shown the delays prejudiced his defense.

## *Amendment of the Indictment*

(28) Benson next contends that the Superior Court erred in granting the State's motion to amend the indictment during the first trial. We review the Superior Court's decision on a motion to amend an indictment for abuse of discretion.[20]

(29) Court I of the indictment originally charged Benson with intentionally engaging in sexual intercourse with the Child between May 1, 2014 and November 1, 2014 when the Child was under the age of twelve and Benson was over the age of eighteen. A day after the parents' testimony and shortly before the close of the State's case in the first trial, the State moved to amend the beginning of the date range in the indictment to October 1, 2012. Benson objected, arguing that the amendment would prejudice his substantial rights because he had been preparing a

---

[20] *Coffield v. State*, 794 A.2d 588, 590–91 (Del.2002).

13

trial defense based on a six-month time period and now had to prepare an alibi defense for an additional eighteen months. The trial judge noted that the amendment would not charge a new offense and that she did not believe there was substantial prejudice, but gave Benson's counsel the opportunity to confer with his client regarding whether he needed more time. After speaking with Benson, defense counsel informed the Superior Court that Benson was incarcerated from November 2012 through March of 2013. Without waiving Benson's objections to amendment of the indictment, the parties agreed to the indictment date range starting on April 1, 2013. The Superior Court granted the State's motion to amend the date range in the indictment.

(30) The Superior Court may permit amendment of an indictment at any time before verdict "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."[21] Benson argues that the amendment prejudiced his substantial rights because he could no longer pursue "his initial defense strategy of not being around the complainants [sic] person or home anytime after the summer of 2013."[22] As the Superior Court recognized, it is difficult to understand how this strategy would aid Benson or how its absence would prejudice his substantial rights. The family member witnesses were unable to identify the date

---

[21] Super. Ct. Crim. R. 7(e).

[22] Opening Brief at 7.

14

of the incident with Benson, but were clear that the incident occurred at a particular location (where the family resided for approximately a year-and-a-half before moving to another residence in October 2014). Even assuming Benson could prove that he did not see the family or go to their home after the summer of 2013, it would not be particularly helpful to his defense because none of the family testified that the incident occurred after the summer of 2013. Nor would the absence of this defense prejudice his substantial rights. The Superior Court did not err in granting the State's motion to amend the indictment.

## *Double Jeopardy Claim*

(31) Benson next argues that the Superior Court erred in denying his motion to dismiss based on the Double Jeopardy Clause.[23] The origins of this claim lie in the first trial. After the jury indicated for a second time that they could not agree on a verdict,[24] the trial judge told the parties she intended to declare a mistrial. The trial judge asked the parties whether they wished her to see if she could find out what the split was when she spoke to the jurors after she declared a mistrial and excused them from the courtroom. Both sides said yes. The trial judge proceeded to declare a

---

[23] Benson also refers to collateral estoppel in this section of his opening brief, but does not make any arguments based upon collateral estoppel.

[24] Following the jury's first indication that they could not agree on a verdict, the Superior Court gave an *Allen* charge. An *Allen* charge "is a request from a trial court to the jury to attempt to come to a decision in the case without abandoning any firmly held beliefs." *Bradshaw v. State*, 806 A.2d 131, 134 (Del. 2002).

mistrial and excuse the jury. After speaking to the jury, the trial judge returned to the courtroom and informed the parties that the jury split had been nine to three in favor of a guilty verdict on the lesser-included offense of attempted first-degree rape.

(32) During the second trial, Benson argued that retrial on the first-degree rape charge was a double jeopardy violation because the first jury implicitly acquitted him of first-degree rape. He contended that the jury implicitly acquitted him of first-degree rape because: (i) the jury instructions provided that if the jurors did not find Benson guilty of first-degree rape or had any reasonable doubt as to an element of the crime they had to find him not guilty of first-degree rape and then go on to consider the lesser-included offense of attempted first-degree rape; and (ii) the trial judge told the parties that the jurors were split nine to three in favor of a guilty verdict on attempted first-degree rape, which meant the jurors must have found him not guilty of first-degree rape. The State opposed the motion, arguing there was no final judgment of acquittal in the first trial that implicated double jeopardy principles.

(33) The Superior Court denied Benson's motion. Relying on the U.S. Supreme Court's decision in *Blueford v. Arkansas*,[25] the Superior Court concluded that retrial did not violate double jeopardy principles.

---

[25] 566 U.S. 599 (2012).

(34)    We review claims alleging an infringement of a constitutionally protected right, including the right not to be subjected to double jeopardy, *de novo*.[26] The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy."[27]  "Under double jeopardy principles, an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge."[28]  Section 207(1) of Title 11 provides that "there is an acquittal if the prosecution resulted in a finding of not guilty by the trier of fact or in a determination that there was insufficient evidence to warrant a conviction."  Double jeopardy protections do not apply when a trial ends in a hung jury.[29]  Benson continues to argue that the jury instructions and the jurors' comments to the judge after the first trial mean that he was acquitted of first-degree rape and could not be retried for that charge.

(35)    As the Superior Court recognized, this case is somewhat similar to *Blueford*.  In *Blueford*, the U.S. Supreme Court held that a retrial did not violate the Double Jeopardy Clause after the first jury told the trial judge, before jury

---

[26] *Sullins v. State*, 930 A.2d 911, 915 (Del. 2007).

[27] U.S. Const. amend. V.

[28] *Capano v. State*, 889 A.2d 968, 982 (Del. 2006) (citing *Arizona v. Rumsey*, 467 U.S. 203, 211 (1984)).

[29] *Bowers v. State*, 2014 WL 2094133, at *2 (Del. May 16, 2014) (citing *Richardson v. United States*, 468 U.S. 317, 325-26 (1984)).  *See also* 11 *Del. C.* § 207(4)(b) (providing that prosecution is not barred by a former prosecution if the trial court declared a mistrial in accordance with law).

17

deliberations concluded and before the trial court declared a mistrial, that they were unanimously against guilt as to capital murder and first-degree murder charges, but deadlocked on other charges.[30]   The U.S. Supreme Court rejected Blueford's contention that the foreperson's announcement of the unanimous votes as to the capital and first-degree murder charges represented his acquittal on those charges.[31] The Court found the announcement was not final in light of the jury's continued deliberations and the absence of anything in the jury instructions to prevent the jury from reconsidering their votes.[32]  As in *Blueford*, there was no judgment of acquittal here or final resolution of the charges against Benson by the jury.  There was never even any announcement, unlike *Blueford,* that the jury was unanimously against Benson's guilt as to the more serious offense.  In the absence of a verdict by the first jury that Benson was not guilty of first-degree rape, the Double Jeopardy Clause did not bar Benson's retrial for this charge.

### *Jury Instruction for a Lesser-Included Offense*

(36)   Benson next argues that the Superior Court violated the party autonomy rule by inducing the State to request a jury instruction for attempted first-degree rape or by giving the instruction in the absence of a request.  Under the party autonomy

---

[30] *Blueford*, 566 U.S. at 608-09.

[31] *Id.* at 606.

[32] *Id.* at 607-08

18

rule, "the trial judge should not give an instruction on an uncharged lesser offense if neither side requests such an instruction because to do so would interfere with the trial strategies of the parties."[33] Benson did not raise this claim below so we review for plain error.[34]

(37) At the end of the first day of the first trial, the trial judge indicated that she was going to review the draft jury instructions. She told the parties they should start thinking about whether they were going to request any lesser-included offenses so that any such instructions could be included. The prosecutor immediately said the State would be asking for a lesser-included offense instruction. On the second day of the first trial, the trial judge asked counsel to look at the draft jury instructions over the lunch break and indicated that the most time-sensitive matter was whether there would be instructions for lesser-included offenses. After the lunch break, the prosecutor said the State wished to include one instruction for a lesser-included offense, which the prosecutor confirmed was attempted first-degree rape. Benson's counsel initially questioned the basis for the instruction, but upon learning that it was based on a lack of clarity in the Child's testimony concerning whether there was sexual intercourse, said he did not oppose an instruction for attempted first-degree rape. During the second trial, the prosecutor responded affirmatively when the trial

---

[33] *State v. Bower*, 971 A.2d 102, 107 (Del. 2009).

[34] Supr. Ct. R. 8.

19

court judge asked if the State continued to request a lesser-included jury instruction for attempted first-degree rape.

(38)  This record belies Benson's claim that the Superior Court violated the party autonomy rule by inducing the State to request a jury instruction for attempted first-degree rape or by giving the instruction in the absence of a request. The Superior Court judge gave an instruction for a lesser-included offense because the prosecutor requested that instruction.

### *Insufficiency of the Evidence*

(39)  Benson contends that there was insufficient evidence to find him guilty of attempted first-degree rape. He relies on the lack of eyewitnesses, his own testimony, testimony of the State witnesses that is consistent with his account of what happened, and inconsistencies in the testimony of the child witnesses. We review this claim *de novo* to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of all the elements of the crime.[35]  Under 11 *Del. C.* § 773, "[a] person is guilty of rape in the first degree when the person intentionally engages in sexual intercourse with another person and…[t]he victim has not yet reached that victim's twelfth birthday, and the defendant has reached that

---

[35] *Cline v. State*, 720 A.2d 891, 892 (Del. 1998).

defendant's eighteen birthday."[36] Under 11 *Del. C.* § 531, "[a] person is guilty of an attempt to commit a crime if the person…[i]ntentionally does…anything which, under the circumstances as the person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person."[37]

(40)   Viewing the evidence in the light most favorable to the State, a rational juror could find Benson guilty of attempted first-degree rape.  The evidence included the Child's testimony regarding what Benson did to him, that the Child was under twelve-years old, and that Benson was more than eighteen-years old at the time the family lived on Church Street.  Multiple witnesses, including Benson, testified there was an incident involving Benson and the family at the Church Street address.  As Benson points out, there were conflicts and inconsistencies in this testimony. "Under Delaware law, the jury is the sole trier of fact, responsible for determining witness credibility, resolving conflicts in the testimony, and drawing any inferences from the proven facts."[38]  It was within the jury's discretion to accept one witness's testimony and reject the conflicting testimony of other witnesses.[39]  Any rational

---

[36] 11 *Del. C.* § 773(a)(5).

[37] 11 *Del. C.* § 531(b).

[38] *Morgan v. State*, 922 A.2d 395, 400 (Del. 2007).

[39] *Pryor v. State*, 453 A.2d 98, 100 (Del. 1982).

trier of fact could have found the essential elements of attempted first-degree rape beyond a reasonable doubt.

### *The Child's False Testimony*

(41)  Finally, Benson argues that the State violated his due process rights by knowingly presenting the Child's false testimony to obtain his conviction. Benson did not raise this claim below so we review for plain error.[40] There is no plain error here.

(42)  Benson argues that the Child's trial testimony was false because there were inconsistencies between that testimony and his description of the assault to his therapist, during his interview at the CAC, during his Section 3508 hearing, and during the first trial. He ignores the Child's own repeated statements that Benson sexually assaulted him in the bathroom of the Church Street address. Inconsistencies in the Child's statements do not show that the prosecutor knowingly suborned perjury. In addition, the Child was subject to direct and cross-examination about the inconsistencies in his previous statements. It was within the province of the jury to assess the witnesses' credibility and determine whether any inconsistencies created a reasonable doubt as to Benson's guilt.[41]

---

[40] Supr. Ct. R. 8.

[41] *See supra* ¶ 40.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice